696 F.Supp. 444 (1988)
Craton LIDDELL, et al., Plaintiffs,
v.
BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MO., et al., Defendants.
No. 72-100 C (5).
United States District Court, E.D. Missouri, E.D.
August 4, 1988.
Motion to Alter or Amend Judgment Denied September 22, 1988.
*445 *446 *447 Wayne C. Harvey, St. Louis, Mo., Michael A. Middleton, Columbia, Mo., William Taylor, Washington, D.C., for Caldwell/NAACP Plaintiffs.
Kenneth C. Brostron, Lashly, Baer & Hamel, St. Louis, Mo., for City Bd. defendants.
Michael J. Fields, Bart A. Matanic, Asst. Mo. Atty. Generals, Jefferson City, Mo., for State of Mo.
Craig M. Crenshaw, Jr., Jeremiah Glassman, U.S. Dept. of Justice, Washington, D.C., for U.S.
Charles Werner, St. Louis, Mo., for Missouri NEA.
Andrew J. Minardi, Joseph D. Ferry, St. Louis, Mo., for St. Louis County defendants.
Darold E. Crotzer, Jr., St. Louis, Mo., for Bayless, Jennings, Normandy and Wellston School Districts.
George J. Bude, St. Louis, Mo., for Brentwood, Clayton and Hancock Place School Districts.
Richard Ulrich, James Sanders, St. Louis, Mo., for Maplewood-Richmond Heights School Dist.
Edward J. Murphy, Jr., Garry Seltzer, St. Louis, Mo., for Riverview Gardens School Dist.
*448 James J. Wilson, St. Louis City Counselor, St. Louis, Mo., for City of St. Louis.
Charles R. Oldham, St. Louis, Mo., for Teachers Local Union 420.
Joseph Niemann, Eric Schmitz and Jordan Cherrick, St. Louis, Mo., for St. Louis County Special School Dist.
Bertram W. Tremayne, Jr., St. Louis, Mo., for Kirkwood and University City School Districts.
Robert P. Baine, Jr., St. Louis, Mo., for Hazelwood School Dist.
John Gianoulakis, Mark Bremer, St. Louis, Mo., for Mehlville, Pattonville and Ritenour School Districts.
Douglas A. Copeland, Robert W. Copeland, St. Louis, Mo., for Rockwood and Webster Groves School Districts.
William P. Russell, Joseph McDuffie, St. Louis, Mo., for Liddell Plaintiffs.
Anthony J. Sestric, St. Louis, Mo., for St. Louis Collector of Revenue.
Shulamith Simon, St. Louis, Mo., for Court-appointed amicus curiae.
Henry D. Menghini, Robert J. Krehbiel, St. Louis, Mo., for Affton & Lindbergh School Districts.
Frank Susman, St. Louis, Mo., for Ferguson-Florissant School Districts.
Robert G. McClintock, St. Louis, Mo., for Ladue School Dist.
Donald J. Stohr, James Erwin and R.J. Robertson, St. Louis, Mo., for Parkway School Dist.
Kenneth V. Byrne, Schlueter & Byrne, St. Louis, Mo., for Valley Park School Dist.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
In 1975, the St. Louis Board of Education entered into a consent decree with plaintiffs who represented the black school children of north St. Louis. The decree "requir[ed] [the district] to take affirmative action to [permit] plaintiffs the right to attend non-segregated and nondiscriminatory schools." As part of the decree, the Board opened ten magnet schools in 1976-77. Though the consent decree itself soon foundered and the defendants City Board and State of Missouri were later found liable for segregating the St. Louis schools, the original magnet schools continued to operate and were joined by others, bringing the total number of magnet programs in the city of St. Louis to 25.
Intradistrict magnet schools were established during the phase of litigation when desegregation efforts were limited to the reassignment of city students and staff. As part of the desegregation remedy, the "magnet specialty costs" of those magnets (related to specialized staffing and instructional resources required by the magnet focus) were to be shared equally by City Board and the State of Missouri. The City Board remained responsible for funding the general operations of those magnets.
Interdistrict (Settlement Plan) magnet schools, on the other hand, were established with the intent of attracting suburban students to the city, thereby expanding the number of integrated opportunities in city schools while relieving plaintiff class students of the full burden of transportation. Given the primary remedial role the interdistrict magnets were assigned in this case and the extent to which Missouri was judged liable for school segregation in St. Louis, both the District and Appellate courts assigned the full cost of operations and capital improvements of these schools to the State.
No programmatic differences exist between intradistrict and interdistrict magnet schools. Rather, the distinction is one of funding and the attendant obligation of the interdistrict magnets to enroll a significant percentage of white suburban students.
In Liddell VII, 731 F.2d 1294 (8th Cir. 1984), the Court of Appeals defined the basic features of effective magnet schools: "... individualized teaching, a low pupil-teacher ratio, specialized programs tailored to students' interests, enriched resources and active recruitment." Id. at 1311. These characteristics of magnet schools augment the level of educational quality required to reach the AAA rating, the top classification awarded by the Missouri Department *449 of Elementary and Secondary Education (DESE). It was this AAA standard to which the State and City Board were required to return the St. Louis schools as part of their remedial duty to eliminate from the system all vestiges of unconstitutionality.
Liddell VII stipulated that "... the Settlement Agreement ... provides for the expansion or replication of existing magnet schools and programs with total enrollment to reach ... twelve to fourteen thousand ... in city magnets." Id. at 1309-1310. Enrollment increases were to be phased in over four years. (The Settlement Agreement referred to here is the one now commonly referred to as the Voluntary Plan entered into by most of the parties in 1983).
In September 1986, the Eighth Circuit directed in Liddell IX, 801 F.2d 278 (8th Cir.1986), that "... 2,000 more students [be accommodated] in interdistrict magnet schools by the opening of the 1987-88 school year and a total of 6,000 students in these magnets by the 1989-90 school year." Id. at 292. A joint planning effort was required, involving City Board, the State, suburban districts and an "expanded" Magnet Review Committee (MRC).
The MRC was to review all magnet school proposals in light of the goal that, by 1988-89, forty percent of white students in interdistrict magnets should be suburban students. All new magnets were to reach this goal within three years, or
... the State may move the district court to have that magnet converted to an intra-district magnet or terminated. The State's cooperation with the City Board in reaching the enrollment goals shall be considered an important element in deciding to convert or terminate a magnet. Liddell IX at 283.
Pursuant to Liddell IX, MRC's mandate was to review all new and existing proposals for magnet schools and develop proposals for the 2,000 student goal set by the Eighth Circuit. Proposals were filed with the District Court sixty days later. In March 1987, the Court in L(1336)87 rejected the proposals for new magnets, as the "proposals have ... been hastily conceived and consequently contain serious flaws."
The Court directed that MRC develop "... a long-range comprehensive master plan for magnets ..." and that:
The plan should achieve at least the following:
A. Coordinate programs in all magnets, balancing the number of distinctive programs which have proven effective and attractive to black and white students.
B. Articulate program offerings at all grade levels so that magnet students can proceed through the grades and receive a sequential, developmental set of educational experiences.
C. Insure that new interdistrict magnet seats are not created by reducing seats in intradistrict magnets. The number of intradistrict seats should be sustained or expanded.
D. Make use of available building space requiring a reasonable capital outlay for facility modification and renovation. Use sound buildings made available through enrollment consolidation on sites which provide room for expansion.
E. Cluster magnet sites where possible, particularly for offerings with related program specializations, to reduce administrative and transportation costs. [L(1336)87]
Subsequently, the Court modified that Order, designating instead a panel of outside experts to develop the comprehensive plan. L(1436)87. The Eighth Circuit in Liddell XII affirmed the decision of the District Court to appoint an outside panel to develop a comprehensive long-range plan for St. Louis magnet schools.
The Magnet Panel proceeded to sift through the numerous documents filed in this case regarding magnets. In conjunction with the examination of written documents, panel members visited several current magnets as well as proposed sites. The panel sought input from the local community via written responses to Panel letters, and small group meetings with school representatives, administration representatives, City Board and State officials, attorneys, desegregation committee directors *450 and St. Louis city officials. Community meetings were held with magnet teachers and magnet school parents. Area leaders of business, higher education, cultural institutions and religious groups were contacted. Finally, two public meetings to present the Panel's proposals were held.
On September 14, 1987 the Magnet Panel filed a comprehensive, long-range plan for magnet schools (hereinafter referred to as Original Plan). L(1585)87. After the Original Plan was submitted, various parties and committees filed their responses. (See court docket sheets for complete listing of responses). A hearing was scheduled to begin March 14, 1988. It soon became apparent that the parties could agree on some of the issues raised by the Original Plan, and thereby limit the scope of the hearing. The District Court then directed in L(1741)88 that:
... the Magnet Panel ... convene various parties for the express purpose of identifying areas of agreement and/or areas where the Panel may wish to modify its recommendations to the Court based on an analysis of the responses filed to the magnet plan and discussions of the parties.... In the absence of agreement among the parties and the Magnet Panel, the Panel shall determine if it wishes to reaffirm the comprehensive plan previously submitted or make modifications to its recommendations.
As directed, the panel met with designated parties on January 29-30, 1988 for discussions and negotiations. The panel then reported in L(1796)88 that "... because of the considerable differences remaining and the deterioration of some of the agreements after the meeting, the magnet panel must reaffirm its original proposal to the Court."
Various parties continued negotiations in an attempt to reach agreement on the elements of a comprehensive magnet plan. On March 10, the Magnet Panel submitted a revised plan for consideration by interested parties (hereinafter referred to as Plan A). L(1822)88. On March 14, the Court met with interested parties and Dr. Tracy Libros (MRC Executive Director) to review Plan A. Changes to Plan A were presented by Dr. Libros and parties' concerns were voiced. The hearing was postponed until March 17, 1988 while parties reviewed Plan A's changes, which were later incorporated into a final revised magnet plan (filed on March 15, 1988), (hereinafter referred to as Plan B). L(1840)88.
On March 17, 18, 23 and 24, the Court heard testimony and received evidence regarding the Original Plan and Plan B. The Court then began the task of resolving the magnet schools' problem. In doing so, the Court has enlisted the aid of its financial advisor, Warren M. Brown, and his associate Jay Moody. They were directed to inspect all of the proposed magnet school sites, review the Zurheide-Hermann Report with respect to certain magnet capital costs and consider budgetary requirements for capital improvements.
The Court has carefully reviewed all of the appellate decisions in this case, as well as the District Court's findings concerning magnet schools (also known simply as "magnets"), the Magnet Panel's Original Plan and Plan B, the responses of all the parties and committees to those plans, the evidence adduced at the magnet plan(s) hearing, and all other pertinent matters filed in this case regarding magnets. With that review and after conferences with Warren M. Brown and Jay Moody concerning their assignment, the Court is now ready to present a magnet school plan for St. Louis.
This comprehensive plan for the magnet schools in St. Louis attempts to achieve several goals: student desegregation; effective education; equity and equality of access; the efficient use of professional and physical resources; and the introduction of an incremental, financially prudent approach to school improvement.
1. Student Desegregation. The Courts have approved both intradistrict and interdistrict plans that include magnet schools as a way of providing quality integrated education for black and white students, especially for black city students denied such opportunity in the past. This plan embraces a definition of student desegregation *451 that requires a racially balanced student body in each magnet school.
The Magnet Plan's definition of racial balance considered the following facts: (a) approximately two-thirds of the black students in the city public schools attend segregated schools; (b) the waiting list of black students for magnet schools is substantially longer than that of white students; (c) the public school population in the city of St. Louis is 75 to 80 percent black; (d) all white students in the city public schools attend desegregated schools; and (e) all white students in participating county districts have access to a desegregated education since, according to the Settlement Plan, approximately one-fourth of the students in their districts should be black. These factors seem to justify allocating a slightly higher proportion of magnet seats for black students.
2. Effective Education. Magnet schools are identified in this plan as unique but not elite schools. They should provide a unique education that is available to students of all aptitudes who express interest in a particular theme. As such, these schools should directly benefit the students who enroll, as well as indirectly benefit the entire system in that they indicate ways of achieving effective education that other schools are also capable of achieving. Thus, the staffing and resources available to magnets may differ slightly from those available to other schools, but should not deviate so greatly that other schools could never attempt to emulate the educational methods of magnets. By being inclusive rather than exclusive, magnet schools point the way toward effective education for all.
An important component of effective education that this plan embraces is that of continuity. The major magnet themes have schools at the various grade levels of the school system. Also, any student who completes the final grade in a magnet of a specific theme is guaranteed a seat in a magnet school with a similar theme at the next educational level. Thus, the plan achieves continuity and coordination.
3. Equity and Equality of Access. Equity has to do with the distribution of common resources in a way that is fair. As such, equity has to do with the achievement of fairness in a collectivity of people. Equality is concerned with individuals and whether they have access to the use of the common resources. When equity is recognized as a group phenomenon, equity and equality are seen as complementary rather than contradictory. Thus equity and equality, when operating simultaneously, strengthen each other. This plan embraces both equity and equality to yield the strength of their joint effects.
4. Efficient Use of Resources. The Court of Appeals has observed that magnet school facilities should be "reasonably comparable" to county schools, since these schools are expected to draw students from city and county school districts. This plan attempts to balance the needs of magnet schools with financial realities. Most proposed magnet schools are to be located in existing facilities, while a few new buildings are approved. These new buildings will link the St. Louis Public School System to other community resources and institutions. Where possible, magnet schools are located near arterial transportation routes so that they are easily accessible to county and city students. This Plan strives to make the most efficient use of school facilities.
5. Institutional Collaboration. Strong and direct working relationships between magnet schools and local colleges, universities and cultural institutions are important for several reasons. First, such institutions have much to offer the schools in terms of human and physical resources. Second, collaboration between public schools and higher education institutions can be beneficial in a broader sense by providing curriculum development, staff development and teacher training opportunities. Finally, the prestige associated with such institutions can help enhance the image of the public schools in general and the magnet schools in particular.
By linking magnet schools directly with respected local institutions, the image of individual city schools and the entire city school system can be enhanced. A related *452 advantage is that these linkages can aid greatly in student recruitment; people who are not familiar with a particular magnet program may very well be familiar with a local institution that is affiliated with the school. This association can increase knowledge about and interest in the magnet.
St. Louis is blessed with a large variety of public, private and voluntary associations. It would be a mistake to implement a comprehensive program of magnet schools without taking advantage of these resources. St. Louis is known nationwide for its outstanding cultural institutions. The Science Museum, St. Louis Zoo and the Missouri Botanical Garden offer opportunities for collaboration with magnet schools which would enhance both the schools and the institutions.
6. Long-Range School Improvement. The general public is reluctant to accept wholesale change that requires a substantial, immediate investment of public resources. If the citizens of the city of St. Louis are to invest in a comprehensive school improvement program, they must be convinced that resources will be used prudently and that their investment will result in an effective public school system. This magnet plan promotes incremental change. Progress in the magnet schools can foster greater public confidence in the public schools, resulting in similar benefits for other schools in the system.
7. Unified System of Magnet Schools. Artificial distinctions between intradistrict and interdistrict magnets are eliminated. Such distinctions in practice do nothing to further desegregation. In fact, they probably harm desegregation efforts by creating an unstable situation in which consistent program operations and sound fiscal management are difficult to attain.
A new funding arrangement that recognizes magnet schools as a cohesive entity is essential. The new funding formula requires joint responsibility of the local school district and state government for all magnet schools, rather than a separate fractionated responsibility. Under a unified system of magnet schools, all magnet seats are available to all students. The cumbersome and potentially counter-productive practice of basing funding on the proportion of seats occupied by county students, in particular magnet schools, is eliminated making way for a consolidated system of magnet schools.
This plan is designed to provide an equitable and unitary system of magnet schools that effectively educates city and county students. The plan is economical, efficient and feasible. Moreover, it provides increased access for all groups of students to a desegregated quality education.
The Court's Magnet Plan is detailed under the following thirteen (13) identified categories:
1. funding;
2. collaborative planning;
3. parental involvement;
4. administration;
5. admission policies;
6. admission priorities;
7. placement;
8. measures of success;
9. magnet themes, magnet locations, magnet targets;
10. capital budget;
11. staffing needs and pupil-teacher ratios;
12. enriched resources;
13. implementation.

I. Funding.

The current allocation of fiscal responsibility for magnets between the two paying parties is assigned as follows:
The State is required to pay 100% of capital and operating costs for 6,000 interdistrict seats, 50% of capital costs for 8,000 intradistrict magnet seats, and 50% of magnet specialty costs for 8,000 intradistrict magnet seats.
The City Board is required to pay 50% of capital costs for 8,000 intradistrict magnet seats, 100% of regular operating costs for 8,000 intradistrict magnet seats, and 50% of magnet specialty costs for 8,000 intradistrict seats.
*453 In addressing the issue of magnet school funding, the Court finds that:
1. A single and permanent percentage for capital and operating costs should be assigned to the two paying parties. The relative financial liability has been determined previously by the Courts. The unified funding formula maintains that relative liability.
2. The calculation of the City Board and State share should be based upon the total number and proportion of such seats each is ultimately responsible for funding, i.e., 6,000 interdistrict and 8,000 intradistrict seats. This number and proportion of seats should be funded as seats, regardless of which particular buildings house these seats.
The specifics for the operational changes to maintain current levels of fiscal responsibility are detailed as follows:
Capital costs.[1] Both City Board and the State have made capital expenditures for magnets. Both have provided funds for some capital improvements for existing intradistrict magnets. The State has provided funds for some capital improvements of existing interdistrict magnets. City Board has provided a capital resource in the form of buildings used as magnets. Substantial capital improvements are still required for existing magnet buildings retained for magnet use in this plan. This plan requires both City Board and the State to contribute to the capital costs for all magnet school seats.
State Share: The required 6,000 interdistrict seats account for 43% of the total of 14,000 seats; the required 8,000 intra-district seats account for 57% of the total. The State is obligated to fund 100% of capital costs for 43% of magnet seats and 50% of capital costs for 57% of magnet seats. Thus, the State's share of capital costs can be calculated as follows:
(1.00 × .43) + (.50 × .57) = .715
Overall, the State's capital obligation for magnets is 71.5% of the total capital funds required to reach full implementation. Therefore, the State is required to pay 71.5% of all magnet school capital costs approved as necessary for full implementation of this plan.
City Board Share: City Board is obligated to fund 0% of capital costs for 43% of magnet seats and 50% of capital costs for 57% of magnet seats. Thus, City Board's share of capital costs can be calculated as follows:
(0.00 × .43) + (.50 × .57) = .285
Overall, City Board's capital obligation for magnets is 28.5% of the total capital funds required to reach full implementation. Therefore, City Board is required to pay 28.5% of all magnet school capital costs approved as necessary for full implementation of this plan.
Operating Costs:[2] The State pays all operating costs (regular and magnet) for interdistrict magnets, while City Board pays the largest proportion of operating costs for intradistrict magnets (all regular and half of magnet costs). If all 14,000 magnet seats were fully implemented, each entity would be paying its designated share of the costs. However, since magnet school implementation has been slower than anticipated, the allocation of operating costs by specific magnet school buildings creates a counterproductive incentive structure and adds yet another layer to the complexities surrounding magnet schools, hampering full and effective implementation.
Not only is this incentive structure counterproductive, it does not appear necessary within the parameters established by the courts. The formula for allocating fiscal responsibility for magnets' operating costs parallels the approach taken to allocating responsibility for capital costs.
State Share: For the 6,000 interdistrict seats (43% of the total number of required seats), the State is obligated to fully fund operating costs; that is, 100% of the regular operating costs and 100% of the incremental *454 magnet costs. For the 8,000 intradistrict seats (57% of the total number of required seats), the State is obligated to fund 0% of the regular operating costs and 50% of the incremental magnet costs. Thus, for the total regular operating costs of all magnets in a given year, the State's share can be calculated as follows:
Regular operating costs: (1.00 × .43) + (0.00 × .57) = .43
For the total incremental magnet costs of all magnets in a given year, the State's share of that total can be calculated as follows:
Incremental magnet costs: (1.00 × .43) + (.50 × .57) = .715
City Board Share: For the 6,000 interdistrict seats (43% of the total number of required seats), City Board is obligated to provide no funds; that is, 0% of the regular operating costs and 0% of the incremental manget costs. For the 8,000 intradistrict seats (57% of the total number of required seats), City Board is obligated to fund 100% of the regular operating costs and 50% of the incremental magnet costs. Thus, for the total regular operating costs of all magnets in a given year, City Board's share can be calculated as follows: Regular operating costs: (0.00 × .43) + (1.00 × .57) = .57
For the total incremental magnet costs of all magnets in a given year, City Board's share of that total can be calculated as follows: Incremental magnet costs: (0.00 × .43) + (.50 × .57) = .285
Table I[3] summarizes the current relative funding shares of both City Board and State, as described above.
A major purpose of the unified funding formula is to achieve administrative efficiency while maintaining the relative funding liability which has been established by the courts. When applying the unified operating cost formula (for both regular and incremental magnet costs) to actual and projected expenditures, the State and City Board will be funding approximately the same percentage of the total. See, L(1934)88, Exhibit B. Therefore, this plan recommends that, in practice, all operating costs (regular and incremental magnet) for all magnet schools be combined. The State and City Board should then divide the total cost, with each party paying 50% of all such costs. This will simplify even further budgetary and administrative procedures. This unified funding formula should be implemented for all magnet school costs in 1989-90.
This funding strategy is proposed for several reasons. It should create a structure which will allow for more stable operation of magnets. A more useful incentive structure will be in place to encourage efficient operation of all magnet schools. Both paying parties will be able to accurately project fiscal impact. Operations will be stabilized, leading to more efficient use of resources. Finally, a framework will be in place which can minimize disputes and the resulting necessity of resolving those disputes in Court.

II. Collaborative Planning.

This plan encourages a strong linkage between magnet schools and community institutions. The panel met with leaders of colleges and universities, major cultural institutions and businesses in the St. Louis community. Many of these institutions expressed enthusiasm about the possibility of working with the district in designing and implementing new magnet schools.
Strong and direct working relationships between magnet schools, and local colleges and universities and cultural institutions are important for several reasons. First, such institutions have much to offer the schools in terms of human and physical resources. Second, school-higher education collaborations can be beneficial in a broader sense by providing curriculum development, staff development and teacher training opportunities. Finally, the prestige associated with such institutions can help enhance the image of the public schools in general and the magnet schools in particular.
To implement meaningful interaction between schools, higher educational and cultural *455 institutions, planning grants will be made to local institutions that have expressed interest in working with magnet schools in St. Louis. Such grants should be made available immediately to begin planning on-going relationships for the purposes of staff and curriculum development and program implementation. Strategies should also be explored for using magnet schools as laboratory schools for regional teacher training and staff development.
This type of planning must involve all key partners with the district in the magnet school process: magnet school faculty and administrators, parents of current or prospective magnet students, suburban district staff, higher education, cultural organizations and business representatives, community leaders and consultants expert in organizational development and in academic fields related to the magnet themes. State representatives must also be involved in the process.
Institutions receiving such grants would work directly with the school district, as well as seek broader input into the planning process. In the case of programs where new construction is recommended, the institutions should also assist in defining instructional space needs.
Specifically, seven planning grants will be awarded for the following magnets: Gateway High School (1), Gateway elementary and middle schools (1), International Studies high school (1), International Studies middle school (1), Science Center ILC (1), Botanical Garden ILC (1), Early Childhood Centers (1). Each grant should be for approximately $20,000.00 for a total planning grant budget of $140,000.00. The State will provide the funds for these planning grants. The City Board will administer the grants.

III. Parental Involvement.

Clearly, strong support from parents is essential for magnet programs to reach their full potential. The Magnet Panel recommends that the City Board should consider a successful plan, the "Corner School Development Program" developed by Dr. James Comer at Yale University, which could be implemented at each magnet.
Although the Court has no opinion as to the merits of the Comer program, the City Board should determine if this or another model is most appropriate to meet the needs of magnet faculties, parents and students, taking into account existing parent involvement programs to avoid duplicative efforts.

IV. Administration.

There are two critical needs with respect to magnet school implementation and administration. If implementation is to occur quickly and effectively, the district must have more flexibility. This flexibility must, of course, be within the confines established by the courts. However, daily decision-making authority should rest with those directly responsible for implementation of the long-range plan. With greater autonomy and decision-making flexibility for the school district, there must also be greater accountability for implementation. The school district must provide adequate administrative oversight to ensure the timely implementation of a task of this magnitude.
The work of implementing this plan will require careful coordination among various departments of the school district: coordination of program design and educational specifications with facilities development; development and clarification of staffing with personnel; and program development and supervision with instruction.
Cluster/Management Teams. To ensure system-wide articulation and quality of magnet programs, teams of school building program administrators should coordinate magnet programs within each cluster. These teams should meet regularly, probably monthly. Team meetings may address issues of program delivery; serve as a forum for the exchange of ideas; and address the concerns of parents, teachers and students. The participation of principals is essential and should be mandatory.
Staff Assignment for Magnet Schools. Under this plan, some buildings currently used for other purposes will become *456 magnets. In addition, certain magnet programs will be relocated to other sites, in some cases involving a merger of more than one program.
This plan recommends that, for all affected programs, all staff positions should be declared open. Staff working in affected programs and buildings should be given first consideration for any position in the new magnet for which they are qualified and wish to apply. Selection of all staff should be based on the principal's recommendation, subject to applicable statutes and in accordance with district regulations.
Recruitment and Public Information. Personnel in charge of recruitment and public information should be responsible for recruitment and placement of St. Louis students in the magnet program, and should implement the admissions policies recommended in this plan. Personal counseling regarding available educational programs should be provided through this office. The counseling and public information services should be constantly monitored to ensure that accurate and timely advice are courteously given. A complaint Hot Line should be installed to accommodate students and parents who have persisting questions that have not been addressed satisfactorily by the counseling and public information services.
A Parent Information Center staffed by part-time employees, preferably parents, should be established. The Center should have an outreach function for parents of varying social circumstances who may not be well-informed about magnet schools and who may need assistance in completing application forms.
Because magnet schools serve city and county students, the school district and VICC should continue to share in the responsibility for recruitment of students for magnet schools. VICC should continue to be primarily responsible for recruitment of county students; the district should continue to be primarily responsible for recruitment of city students. It is important that recruitment be done jointly and cooperatively so that recruitment activities, application deadlines and placement can be coordinated.
Numerous complaints have been voiced about the lack of accurate information provided regarding admission, placement priorities and offerings available in various magnet programs. Therefore, a "Schools of Choice" information book should be developed which includes the following information for each magnet school:
 Name and location of each magnet
 Grades served
 Brief program description
 "Indicators of interest/success" description ("You should choose this program if you would like a school where ...")
 List of opportunities that are and are not provided at each school ("This school offers ... This school does not have ...")
 Feeder pattern information for elementary and middle schools ("When students leave this magnet, they can attend ...")
 Application dates/placement schedule
 Clear statement of placement priorities
 Waiting list information
 Information on transportation
Because this book should be used by both the school district and VICC in recruiting, it should be developed jointly by City Board and VICC with input from the staff of each magnet school.
Each City Board and VICC staff member who deals with the public regarding school options should have a copy. In conjunction with the distribution of the "Schools of Choice" book, City Board and VICC should conduct a training session for recipients to review the contents and to stress the importance of courteous and positive attitudes in dealing with the public.
The MRC was established to make recommendations regarding the planning and implementation of new magnets established subsequent to Liddell VII and to evaluate the quality of magnet schools. In the past, the MRC has been hampered in the performance of its duties by its membership *457 structure. The parties comprising the MRC membership find it difficult to come to agreement or make reasonable and helpful recommendations to the Court because of adversarial legal positions.
The Magnet Panel recommends a new expanded structure for the MRC. The Court disagrees. This Magnet Plan should eliminate many of the conflicts previously thwarting the MRC's productivity. It is the Court's considered opinion that the presently constituted MRC can function differently than it has in the past. Under the Magnet Plan (as set forth in this opinion), the MRC can overcome any competing interests and provide helpful information on programmatic issues related to effective magnet school implementation through its designated responsibilities for magnet school education.

V. Admission Policies.

The current practice of labeling magnet schools as interdistrict or intradistrict is done primarily for the purpose of assigning fiscal responsibility. However, this labeling practice is not helpful in developing a unitary and coherent system of magnet schools that effectively serves city and county students. Individual students have a wide variety of interests that may not necessarily correspond to the themes of the category of schools in which they are expected to enroll.
An analysis of students from the county who are currently enrolled in city magnet schools shows that a higher proportion attend intradistrict magnets than interdistrict magnet schools. This fact indicates that the admissions process already does, and should continue to make any magnet school available to any eligible student regardless of the school's classification as an interdistrict or intradistrict magnet school. In conjunction with the elimination of these artificial distinctions between magnets, the Court finds that city and county students should be eligible to enroll in any magnet school where there is congruency between the theme of the school and the interest of the student.
Racial Balance. The definition of racial balance for magnet schools will be 55% black/45% white, with an allowable variance of plus or minus five percentage points. The variance will allow for differences between the number of students accepted and those who actually enroll, and to fill vacant seats remaining after a specified date.
Entrance Criteria. Except in limited situations, admission to magnet schools will be based solely on interest. Magnet schools are public schools which should serve the full range of students served by all other public schools in the district. For the magnet programs in this plan, there should be no entrance requirements, other than those which apply to non-magnet schools in the district or as otherwise required by law.[4]
Handicapped Students. To the maximum extent appropriate, the opportunity should be provided to handicapped children to participate in magnet school programs. This includes participation in regular class settings with the use of supplementary aids and services. Such placements should be made in conformity with provisions set forth in the State Plan for Part B of the Education of the Handicapped Act as amended by Public Law 94-142, and Section 504 of the Rehabilitation Act of 1973.
Permanent Assignment. Students should not be required to leave a magnet school (except in conjunction with district-wide policies) or to apply for readmission once they have been accepted. A student admitted to a magnet school in any level served by that magnet, including pre-kindergarten or kindergarten, should have a guaranteed, permanent and continuous assignment until completing the final grade of the course of study in that school.

VI. Admission Priorities.

Educational Continuity. Continuity of placement will continue to be guaranteed for the next level of magnet education to students who complete a lower *458 level within the same magnet cluster of schools. Students in elementary or middle magnet schools are automatically accepted before others for a magnet school of the same theme at the next level for the purpose of guaranteeing continuity in education. However, there will be no admissions preference to a magnet middle school or high school for students who matriculated in lower grade level magnet schools with a theme that differs from the school at a higher level.
Sibling Priority. Second priority (within racial balance requirements) will be for siblings[5] with similar interests who wish to enroll in the same magnet school where a sibling is already enrolled. There is good reason why parents with two or more children should not be required to relate to several different schools at the same grade level. The priority admission for siblings acknowledges this fact.
Additional Priorities for Black Students. After students have been placed in magnets as indicated above, third priority for remaining seats for black students will be for black city students attending non-integrated schools. Fourth priority will be for all other black students residing in the city regardless of school of attendance.
Additional Priorities for White Students. After students have been placed in magnets as indicated above, third priority for remaining seats for white students will be for eligible white county students.[6] Fourth priority will be for all other white students residing in the city regardless of school of attendance.[7]
Pilot Program. The Court recommends that City Board institute a pilot program at three elementary magnet schools located in integrated neighborhoods, granting an admission priority for a portion of the seats at each school to children residing within the residential area in which the school is located. Racial balance guidelines established for all magnet schools should be applicable at each school within the pilot program, and this priority would not serve to interfere with attaining racial balance at each such school.
Priority for students within the residential area should be determined before application of all other admissions priorities except racial balance criteria for the school as a whole, the priority for students within the same magnet feeder pattern (where applicable) and the priority for siblings.
Priority for students within the residential area should be applicable to 25% of the magnet seats at each pilot school. Seats available on such a basis but not filled as of the date of the magnet school lottery would as of that date be available for students from throughout the city and county in accordance with the regular magnet school admissions procedures.
The implementation plan to be prepared by the Board should include recommendations of which schools to include in the pilot program and the description of what shall constitute the appropriate residential area for each school. This portion of the implementation plan should be prepared in consultation with the parties and the affected residential areas. Pilot schools should be selected with a view to stimulating and reinforcing stable residential integration, strong connections between the school and families of children attending it, and the promotion and strengthening of residential revitalization.
The implementation schedule should include a timetable for implementation of this priority in the pilot schools. It should be the expectation that pilot programs in existing magnet schools would be fully implemented in the 1989-90 school year, while programs in any new or newly constructed schools would be fully implemented in the *459 first year of operation of the magnet program at each location.
This pilot program should be fully publicized in magnet school literature and to families living within the affected areas. The progress and success of the pilot program should be evaluated by the Board, the MRC and the parties with regard to serving the goals of school and residential integration, stability and revitalization and educational effectiveness.
Although the Court recommends a neighborhood magnet pilot program, such a program is not a mandatory part of this magnet plan. It is an innovative idea worthy of serious consideration. However, if the City Board should elect to implement this pilot program, the Court insists that it be implemented as outlined above.

VII. Placement.

Numerous concerns have been expressed about late notification regarding magnet school admission status. Such late notification undermines public confidence and generates animosity, undoing much of the positive feeling that magnet school choices can generate. After the phase-in period, magnet school applications should be processed between January and March of the year prior to matriculation.[8] In order to do this, targets used for placements in any given year should be those most recently approved by the Court as of September 1 of each year. Any changes should go into effect the following year.
In any event, the district should have the flexibility to make minor adjustments in targets after this date, particularly as they affect interim targets which may be in place during the phase-in period leading to full implementation.
Placement by Lottery. The present first-come, first-served placement of students in magnet schools may, on the surface, seem fair. However, it has become quite obvious that the system of lining up to be an early applicant can be inequitable. Two-parent families (where one can stay home while the other waits in line all night) and those whose jobs allow them greater flexibility have an unfair advantage over others to gain access to magnet school opportunities.
Since this plan attempts to eliminate inequities, a lottery system for placement will be implemented. Procedures for the lottery system should be developed jointly by City Board and VICC (since both city and county students will be affected) and submitted jointly to the Court. Once the procedures have been approved, the lottery system should be managed and run by the City Board.

VIII. Measures of Success.

A critical test of the success of this magnet plan will be its attractiveness to a sufficient number of city and county residents, resulting in the desired racial balance set for each magnet school and the overall impact of this on the desegregation of the city schools. Magnets should not only be initially inviting places that bring about racial balance; they must also be schools that offer strong academic programs.
Magnet schools are one component of the metropolitan desegregation plan. So, it is necessary to identify criteria by which it can be determined when this component has been fully and effectively implemented.
This magnet plan should be considered to be fully implemented when the following measures of success have been met:
1. Provision for all magnet seats recommended in this plan including enrollment of approximately 14,000 students.
2. Determination that each magnet school has the necessary resources for effective program implementation (including completion of appropriate building renovations and provision of necessary resources).
3. Determination that each magnet school is providing a high quality educational program consistent with its theme.
4. Stable racial balance in each magnet school.

*460 5. A total enrollment (in all magnets) of at least 1,640 white county students.[9]
In order to retain the safeguards provided in Liddell IX, 801 F.2d 278, 282 (8th Cir.1986)[10], at least 1,640 county white students must be enrolled in magnets. If not, the State may petition the Court for a change in the unified funding formula or seek termination of any magnet that fails to seek a significant percentage of suburban white students. The State offers 32% county white enrollment in each magnet as the "significant percentage" required by each magnet to continue to operate. See, L(1892)88, p. 6. The Court finds that 12% is a more reasonable county white enrollment per magnet.[11] The Court adopts 12% as the "significant percentage" for Liddell IX purposes regarding termination of a magnet.

IX. Magnet Themes, Locations and Target Enrollments.

This magnet plan provides for the operation of 27 full-time, self-contained magnet schools. These schools follow the City Board's three-tiered grade level configuration of high schools, middle schools and elementary schools (including early childhood education centers).
The Court was impressed with the Magnet Panel's recommendations regarding magnet themes feeder patterns and allocation of seats. The recommended programs are either proven successful programs or innovative exciting educational programs designed to acquaint students with areas of study found in post-secondary education and in the work force. The magnet programs and seat allocations provide for feeder patterns allowing full matriculation in the relevant thematic cluster. Additional entry level seats at the beginning of each school level allows for the transfer in of students outside the magnet system. The number of seats in various types of magnets has been carefully allocated throughout the system for both geographic and grade level considerations. The Magnet Panel's recommended programming and seat allocations provide for a magnet capacity of approximately 14,000 students.

1. Magnet Themes

The Court adopts and incorporates into its magnet plan the concepts and principles set forth by the Magnet Panel in its Original Plan, L(1585)87, plus the AAA magnet recommended in Plan B, regarding magnet themes, programs and feeder patterns. The magnet schools are organized around seven thematic clusters: Early Childhood, Gifted International Studies, Visual and Performing Arts, Math/Science/Technology, General Academic and Military. Within each cluster, the following programs are approved:
Early Childhood
ECC I
ECC II
ECC III

*461 Gifted

CJAElementary
CJAMiddle
International Studies
Foreign LanguageElementary
Foreign LanguageMiddle
Int'l. StudiesHigh School
Visual and Performing Arts
VPAElementary I
VPAElementary II
VPAMiddle
VPAHigh School
Math/Science/Technology
Science Center/ILCElementary
GatewayElementary
Botanical Gardens/ILCMiddle
GatewayMiddle
GatewayHigh School
General Academic
MontessoriPreschool
MontessoriElementary
ABI IElementary
ABI IIElementary
ABI IIIElementary
IGEElementary
AAAMiddle
MetroHigh School
Military
MilitaryMiddle
Naval Jr. ROTCHigh School
The Court approves and adopts as part of its magnet plan the programs created within the Math/Science/Technology cluster, although these programs require construction of three new magnet facilities and the conversion of O'Fallon from vocational education use to magnet use[12] The Science Center and the Gateway Magnets represent cooperative ventures with existing cultural institutions. These programs are designed to meet the needs of students in a sophisticated technological society.
O'Fallon will be known as Gateway High School and will build its program around the existing Academy of Math and Science (including its Air Force ROTC unit). Courses in aerospace technology, physical and biological sciences, health careers,[13] computer science, and other high technology programs will be offered. Programs currently at O'Fallon which will remain are:
Aviation Maintenance (airframe program)
Chemical/Industrial Lab Technology
Communication Equiment Repair
Community-Based Banking
Computer-Based Technology
Data Processing
Drafting
Electronics Occupations
Pre-Engineering
Possible new vocational courses for Gateway High School would provide an education program in the agricultural sciences:[14] Food Science and Nutrition, Small Animal Management, Horticulture, International Agriculture, and Computers in Agriculture. These programs would emphasize biological, botanical and chemical concepts.
The City Board will have governing and full administrative authority over Gateway High School (as well as all other magnets). Gateway will be staffed under the same staffing guidelines as pronounced earlier in this memorandum opinion. Vocational teachers electing to stay at O'Fallon/Gateway (because course retained) will be City Board employees. Former Special School District (SSD) teachers may elect either to join the City Board's retirement system or *462 remain in their present retirement system. No former SSD teachers will lose their seniority status or suffer a reduction in pay.

2. Magnet Locations

The Court carefully reviewed the Zurheide-Hermann site analysis and the site recommendations made in the Magnet Panel's Original Plan and Plan B. Plan B reflects site location compromises which the Magnet Panel made in response to heated objections by interested parties. The compromises do not represent the best offerings and in some cases conflict with prior court orders. See L(680)86, L(1570)87, L(1436)87 and L(1889)88.
The Court approves the Original Plan's magnet school locations except as follows:
1. The AAA magnet program will be located at Busch, with a target of 300. Hamilton III will be closed and placed in inventory.
2. Soldan High School replaces Northwest High School as the International Studies High School. The target remains at 900. Northwest continues as a nonintegrated high school. Students currently attending Soldan may elect to remain in the magnet program or be reassigned to another high school.
3. Dewey replaces Wilkenson and Madison as the elementary foreign language magnet. The initial target enrollment is 408. The Wilkenson Elementary Foreign Language program has been very successful in attracting large numbers of white county students. It already has outgrown its present site. To expand the target to 360 (as proposed in Plan B) would still not meet potential demand, and the present site is extremely limited in terms of future expansion. To replicate the program at Madison would be extremely costly. Dewey has adequate space for expansion. It will receive a new gymnasium and additional rehabilitation and reconfiguration work. The Court is aware that it is converting a regular integrated middle school. Since most of Dewey's students are transported, readjustment of attendance areas should reassign current Dewey students to other middle schools with minimal disruption. Madison is closed and returned to inventory.
4. Wilkenson replaces Mason as a preschool center, with a target of 306. Wilkenson, a small school on a limited site near the Maplewood/St. Louis border, is ideally situated to be a successful early childhood educational center. Current Wilkenson students will be reassigned to either Dewey or DeAndreis magnets. Mason School, whose current program is expanded at Mullanphy pursuant to the Magnet Panel's plan(s), will be closed and assigned to inventory.
5. The Montessori program will be housed in the Washington and Euclid schools. Washington School will house the Montessori elementary program and Euclid school will house the Montessori preschool center. The Euclid Branch Montessori preschool program has already outgrown its facility. After only one year of operation, it has a substantial waiting list. The plant capacity is fully utilized and cannot be expanded. Euclid Branch, now housing the Montessori preschool program, may continue in operation until the Euclid/Washington configuration is functional. Thereafter, it should be returned to inventory; however, the Court will look favorably upon its continued operation in the future if high enrollments warrant it. Since Euclid Branch is functional, the Court would rather return it to operation to house additional students than have a substantial waiting list. Its continued operation would then necessitate a modification of magnet targets. In summary, Humboldt, Hamilton III, Wade, Ames and Euclid Branch are closed pursuant to the Original Plan; Franklin and Longfellow remain closed per L(1570)87; and Mason and Madison are closed pursuant to this order.

3. Magnet Target Enrollments

Except where noted by the Court in the previous section on magnet locations, the Court adopts and incorporates the Original Plan's target enrollments. There will be no "overage" magnets. The magnet locations and target enrollments are outlined in Tables 2 and 3.

*463 X. Capital Budget.

Working with the financial advisor, the Court developed a magnet capital budget for the 27 magnet schools the Court has approved. The data for this budget was derived from the Zurheide-Hermann Report, the Original Plan, Plan B and the Capital Improvements Order, L(1570)87.
Budget amounts were extracted as closely as possible from the Original Plan and Plan B budgets, as they applied to the 27 magnets approved. Consequently, the cost bases and standards set forth in L(1570)87 were applied here. The Panel left blank in Plan B, approximately $20 million in cost items to be filled in at a later time. These items included for example computer labs, construction of a new elementary ILC magnet, certain rehabilitation and reconfiguration costs, and furniture and equipment costs. The Court has reviewed these items left blank by the Panel and applied standards previously approved in L(1570)87. Costs for the other new facilities were adequately detailed by the Panel.
This approved budget includes the following capital elements: 1) further rehabilitation and reconfiguration of the intradistrict magnet facilities budgeted in L(1570)87; 2) 3 new buildings plus major additions to two schools; 3) rehabilitation and reconfiguration of interdistrict magnets, contemplated but not budgeted in L(1570)87.
Certain adjustments pertaining to costs have been made in order to conform to the Court's magnet plan. Costs unique to this Plan (e.g. a gym and classroom addition at Dewey) are included. Costs no longer required due to location changes (e.g. classroom addition at Wilkenson) have been deleted. Costs for schools not included in the Court's plan have been deleted. Certain amounts have been scaled down pursuant to this Court's determination that item costs were either inflated or not needed. There is no duplication of items or amounts in L(1570)87 and this magnet capital budget.
The court-approved magnet capital budget totals $51,472,626.00. Table 4, Table 5 (and notes), Table 6 and Table 7 detail this budget. This is a separate magnet capital budget to encompass all capital costs required for implementation of the Court's magnet plan, except for those magnet costs already approved in L(1570)87.
The Court now sets forth the funding formula and schedule for payments to provide for the implementation of a magnet capital improvements program in the City of St. Louis:
1) The magnet capital budget is set in the amount of $51,472,626.00, subject to modification by this Court. This magnet capital budget is separate from the capital improvements budget approved in Order L(1570)87. The division of costs for magnet capital, pursuant to the unified funding formula approved herein, is the State 71.5% and the City Board28.5%. Their respective costs are $36,802,928.00 and $14,669,698.00.
2) The City Board is to establish a separate Magnet Capital Account (Account) as an accounting vehicle for administering the magnet capital improvements program. The City Board will place in the fund the respective contributions of the State and the City Board. Monies deposited into the Account shall be invested as provided by State law. Expenditures will be made solely for the purpose of carrying out the rehabilitation, reconfiguration and new construction projects pursuant to this Order. All receipt to and expenditures from the Account shall be reported annually to the Court following a fiscal year independent audit, in accordance with court-approved procedures for desegregation accounting and reporting. The City Board and the State shall share equally the costs of the independent audit.
3) The State shall make three installment payments, each in the amount of $12,267,642.67. The Department of Elementary and Secondary Education (DESE) shall timely certify to the Commissioner of Administration (Commissioner) the amount needed to make the State's payments and to whom the payments are to be made. Within two working days after such certification, the Commissioner shall issue warrants in the amounts and to the party set *464 forth in the DESE's certification. Within two working days of receipt of each of said warrants, the Treasurer of the State of Missouri shall issue and sign checks in the amounts and to the party set forth in said warrants.
4) The State's first payment of $12,267,642.00 shall be made 61 days from the date of this order. If an appeal is taken, the State's first payment shall be made 30 days from the date of affirmance. In the event of reversal, the Court will modify as directed by the Eighth Circuit and will set a new time for payment. After the first payment is made, the second and third payments shall be made annually from the date of the first payment. The State's one-time funding obligation to share the costs of a magnet capital program for the St. Louis City Schools shall be deemed fulfilled and satisfied upon deposit of its third and last payment.
5) The City Board shall make eight (8) installment payments, each in the amount of $1,750,000.00. A ninth (9th) payment shall be made in the amount of $669,699.00. These payments shall be made annually according to the same schedule as outlined above for the State. Thereafter, the City Board shall continue to deposit annually (until further notice of the Court) the amount of $1,000,000.00 into the Account for continued maintenance and additional capital improvements. Interest on the unused balance of State and City Board payments shall be credited against the capital costs funding obligation of each entity regarding Settlement Plan magnets, or in some other way as the Court may later direct.[15]
6) This Court believes that cash flow should meet construction cost pacing, and that all construction projects (as prescribed by this Order) should be completed within four years from the date of the final order.
7) In the event construction costs become due when the Account's monies are insufficient to meet these costs because the City Board's payment is not yet due, the City Board and the State shall enter into a loan agreement. In so doing, the State shall loan the City Board the necessary funds to meet the due and owing construction costs, and the City Board shall repay the loan amount, plus interest, out of its forth coming payment. The City Board's last payment (i.e. 9th payment) shall include, in addition, any interest paid out of prior payments and not used to fund construction projects. Interest on the loan amount shall be calculated as simple interest from the date of the loan until date of repayment. The rate of interest shall be 1% less than the average of the commercial prime lending rates of the Boatmen's National Bank of St. Louis, Centerre Bank N.A. and Mercantile Bank N.A., during each year preceding the due date of City Board's forthcoming payment. For example, if City Board's payment is due on July 1, 1992, then the loan interest rate is 1% less than the average of the three named banks' commercial prime lending rates for the year beginning July 1, 1991, and ending July 1, 1992.
The City Board is not obligated to borrow the funds from the State. It is free to secure the funds from other sources or to make a loan arrangement elsewhere if the terms are comparable or superior to the conditions set forth above.
8) The Court reserves the right to appoint a committee to monitor the construction projects and the Account. However, the Court emphasizes that the City Board is responsible for the implementation of this magnet capital improvements program, subject to the monitoring of the committee to be named later.
9) The following priorities should be set, stressing early commencement of projects which will seal the buildings from further deterioration. Most of these projects should be scheduled so as not to greatly interfere with the students' education, particularly the urgent work of sealing the buildings' exteriors, as follows:
(1) Roofs;
(2) Tuckpointing;

*465 (3) Exterior caulking and painting;
(4) Repair and replacement of windows:
(5) Exterior doors;
(6) Repair of safety hazards on site.
Since a great many of the City Board's proposed rehabilitation projects involve similar operations in a number of schools, it seems more cost-effective to group schools for bidding purposes and to develop plans and specifications which can be used in a number of similar applications. Examples are: roof repair and replacement; tuckpointing; caulking, scraping and painting of outside wood surfaces; boiler inspection and repair; electric service to schools, classroom lights; ceilings, interior paint; basic specifications for elementary gymnasiums.
The Court directs that the Board solicit bids for similar projects to be completed in groups of schools in close geographic proximity, where the projects involve a particular expertise. In this way, a number of contractors can be put to work simultaneously in their area of expertise. Basic work can be completed more quickly, and useful cost comparisons can be made.
After completing most urgently needed plans and specifications, the Board should plan for orderly completion of the entire program approved by the Court. The Board's annual dollar allocation, plus the State's up-front monies (and subsequent payments) should provide monies to complete all basic needs.
(10) The City Board shall report to this Court semi-annually the work projects completed, work in progress and work scheduled for future completion.
The Court's general capital improvements plan, L(1570)87, and this magnet plan provide a grand total of 104 schools, including 27 magnet schools. Since the magnet plan does not duplicate any magnet costs already approved in L(1570)87, the only changes in the general capital improvements plan necessitated by this magnet plan are the elimination of the following costs:

 Hamilton III AAA $ 344,300.00
 Ames 497,684.00
 Wade 959,847.00
 Madison 1,336,656.00
 McKinley 388,291.00
 DeAndries 1,050,639.00
 _____________
 Total $4,577,417.00

These amounts include pro rated shares of magnet reconfiguration and architectural and engineering fees which were not broken out by school in L(1570)87. The State and City Board shall amend the general capital budget accordingly and modify payment amounts, pursuant to Table 6.

XI. Staffing Needs and Pupil/Teacher Ratios.

The Court agrees with the Magnet Panel that a formula-based approach to staffing is necessary in order to reduce budgetary disputes and simplify planning. The Magnet Panel developed different staffing formulas for elementary, middle and high schools. Each formula takes into account the Court-required pupil/teacher ratio (PTR) and number of instructional class periods per day. The Court has reviewed the Magnet Panel's formulas and the data from which these formulas were developed and concurs with the Panel's determinations. The staffing formulas are as follows:

1) Magnet High Schools

To calculate FTE needs for any given target enrollment, the target is simply divided by 24 (average class size), and then divided again by .71 (5 out of 7 periods) to account for planning and other periods when teachers are not providing direct instruction. This yields the required FTE allocation. Table 8 shows the calculation of FTE allocations for magnet high schools.[16]
Recognizing that there are different instructional needs for the different areas of focus offered at the various magnet high schools and that phase-in targets will be needed during the implementation period, administrative flexibility is given to the *466 City Board to make minor modifications in magnet targets, especially during the phase-in period. In this way, the system can be fine-tuned more quickly in response to demand.
In conjunction with this flexibility and for the reasons cited above, City Board will also have administrative flexibility to use the allocated high school FTEs as deemed educationally appropriate and necessary in the high school magnets overall. That is, if the program in one magnet high school requires a greater proportion of small classes and the program in another magnet high school can be effectively implemented with fewer small classes, or if the number of class periods scheduled varies due to programmatic needs, City Board will have the flexibility to make such FTE reassignments as necessary to meet those educational needs.
These are primarily educational decisions which should be made in the first instance by City Board. There is sufficient opportunity through external evaluation to bring to the attention of the Court any negative programmatic impact which might occur through such reassignments. In such a case, the Court will consider assignment of FTEs to their originally designated locations.

2) Middle Schools

The Court of Appeals has directed that the PTR in magnet middle schools be 20:1. All instructional personnel providing direct classroom instruction will be included in the calculation of PTR. This includes all FTEs assigned for direct instruction (in all regular academic subjects areas and including science, computer science, home economics, industrial arts, art, music, physical education and magnet specialty areas).
The calculation of required instructional FTEs for magnet middle schools is simple and straightforward: take the total target enrollment, divide by the average class size of 20, and divide again by .86 (6 out of 7 periods) to account for planning time when teachers are not providing direct instruction. The calculation of FTE allocations for magnet middle schools is shown in Table 9. City Board will have the same flexibility for assigning middle school FTEs as it does for high school FTEs.

3) Magnet Elementary Schools

The Court of Appeals has directed that the average PTR in magnet elementary school be 20:1. At the secondary levels, FTE needs can be based upon the average class size because the average PTR remains constant although the actual size of individual classes may vary.
Elementary schools, however, are organized differently. Students generally remain in one classroom group for much of the day, although there may be times when some students are pulled out for special services such as Chapter I instruction. Students may also be in smaller groups for a portion of the day when receiving instruction in the area of the magnet focus, depending upon the instructional grouping practices dictated by the theme.
Because additional "teacher time" is provided to elementary students through the enriched staffing resources provided, assigning 20 students to each elementary classroom actually has the impact of reducing average class size below this level.
Accordingly, a reasonable and administratively feasible approach which will effectively accomplish the desired goal is adopted. Specifically, one regular classroom teacher should be assigned to each magnet elementary classroom, with 24 students per classroom group. (Minor variations in this number may occur). This would apply to kindergarten through grade five classrooms. For pre-kindergarten classrooms, 20 students should be assigned to each classroom group and teacher. Magnet specialty teachers are not included in this; they provide instruction to students in all classrooms.
Since magnet specialty teachers are not accounted for at the elementary level with this method to staffing, the number of magnet specialty teachers for each such school must be specified. Elementary magnet specialty personnel are shown in Table 10.

*467 XII. Enriched Resources.

The Eighth Circuit has repeatedly described magnets as having "enriched resources." However, there has not been a clear definition of enriched resources nor agreement about what kinds of enriched resources are needed for different programs. Since magnets are different not only from non-magnet schools, but also from other magnets, their needs for enriched resources will vary.
One reason magnet schools need enriched resources is because of the planning, development and implementation of new kinds of instructional programs not typically provided. In providing for such new types of educational opportunities, magnet schools should also be expected to lead the way for other schools, allowing them the opportunity to take advantge of what has been learned from magnets. In this way, magnets can have an impact on school improvement which extends throughout a school district and affects many more students that can be served directly in magnet schools.
1) Staffing. Additional staffing (for magnet instruction and/or reductions in PTR) represents a major enriched resource for magnet schools. In some cases, additional personnel are necessary and appropriate for implementation of the magnet program (such as additional college counselors for the Gateway and International Studies High School magnets and classroom aides for each pre-kindergarten and early childhood center classroom). These personnel are shown in Tables 8, 9 and 10.
2) "A Components in Effect." Liddell XIII, issued shortly after the September 14, 1987 magnet plan submission, indicated that the issue of these programs in magnets should be addressed as part of a comprehensive magnet plan.
Components budgeted at the individual school level (security guards) should be included in magnet school budgets and funded as operating costs. With the middle school staffing formula, separate funding is not required for middle school science teachers. (Any building-specific needs should be included in that building's budget.) Building-specific staff development needs directly related to the magnet focus should also be budgeted at the building level.
Central office functions (Effective and Efficient Schools, Curriculum and Staff Development) serve all schools in the district, including magnet schools. Accordingly, magnet school budgets should include a share of costs for these functions proportional to the number of schools which receive such services. Consistent with the 50/50 split for all operating costs of magnet schools, these costs should be shared equally between City Board and the State. For administrative convenience, these costs may be included in the magnet operating budget.
3) Computer Labs. All magnet schools will have computer labs provided as an enriched resource. In addition to program enhancement, attractive computer labs can serve as an inducement for student recruitment.
4) Extended Day Programs. Extended day programs should be provided in at least several ECC and elementary magnet programs. These should be in place by the third year of implementation. If all ECCs and elmentary magnets are fully subscribed and attracting a racially balanced population (including contributing to achieving the overall goal for white county enrollment), then no extended day programs are required. If not, extended day programs should be located to aid in student recruitment.
5) Staff Development. New magnet programs need extra resources for staff development prior to and/or concurrent with the opening of the program and for the next two summers. Participation in such staff development should be a requirement for teachers assigned to these programs. Other magnets should have additional staff development resources based on evaluation results indicating need.
6) Other Resources. There are certain types of enriched resources which are specifically recommended for the various types of magnets. For instance, magnets which *468 offer a regular curriculum through an alternative instructional approach (such as ABI magnets) do not need enriched library resources; those required of all schools to meet AAA standards are sufficient. On the other hand, magnets dealing with the sciences will need enriched library resources since the range of science materials will be greater than that ordinarily required, materials will need to be updated more frequently and additional technical periodicals will need to be purchased so that students can be exposed to the latest developments. Similarly, programs for gifted students will need additional library resources to provide support for the instructional program.
Programs with an emphasis on languages and international studies will need language laboratories. ILC magnets need funds for contracted services with the Zoo, Science Center and Botanical Garden.
Visual and performing arts magnets need funds to provide for such additional needs as arts consultants, trips to cultural events, supplies and equipment for visual arts classes, media equipment and supplies and musical instruments.
Funds for uniforms are needed for the military middle school program. (At the high school level, uniforms are provided through the Navy.)
This is not necessarily intended as a comprehensive listing delimiting enriched resources needed to effectively implement high quality programs related to specific areas of focus. Additional or alternative resource needs may be identified through the planning and budget process.

XIII. Implementation.

The goal is that all magnet seats will be available by 1992-93 school year. As noted in court order L(1889)88, there should be additional magnet seats available this fall.
The City Board will develop and file with this Court an implementation schedule design to meet the goal of 14,000 magnet students by 1992-93 school year. This implementation schedule should provide specific information for each affected building, including how the implementation and/or phase-in of programs will be handled so as to minimize student disruption.
The highest priority must be given to minimizing disruption of students during the implementation period. This should be the guiding principle in resolving any policy conflicts during this period, even if other policies need to be temporarily violated or their implementation delayed. For instance, to assure program continuity, class size and racial balance may need to vary temporarily from the recommendations in this plan, and actual enrollments may vary from projected targets. It must be understood that it may take several years for all new policies to be fully implemented.
The Magnet Panel, in the Original Plan, makes several recommendations for streamlining the budget process. The Court suggests that the City Board and the State review these recommendations and consider them for implementation. It would be advantageous to all concerned if the budget process were simplified.

SUMMARY
The Court has attempted in this opinion to provide for a long term magnet school program which is designed to eradicate, in part, vestiges of a segregated school system in the greater St. Louis area.[17] This magnet plan is ambitious, but feasible. It can serve its students and entice non-participating youngsters to become involved. *469 Most of all, it can serve as the example of what a good school can be and produce, so that the other schools in the system can do all that is possible to emulate it, thereby upgrading the entire school system.
If the program meets its design expectations, it will do so not because of judicial fiat, but because those involved are willing to release a bit of their sovereignty and cooperate with each other in the resolve to make the endeavor successful.
IT IS THEREFORE ORDERED that the Magnet Plan as provided for in the foregoing opinion be enacted and implemented as set forth.

 TABLE 1
 TABLE 1: RELATIVE FUNDING SHARES OF PAYING PARTIES
 Regular
 Capital Costs Operating Costs Magnet
 State 71.5% 43.0% 71.5%
 City Board 28.5% 57.0% 28.5%
 ______ _______ ______
 Total 100.0% 100.0% 100.0%

 TABLE 2
 Target
 Magnet Schools Enrollment
 Early Childhood Cluster
 Stix ECCI 360
 Wilkinson ECCII 306
 Health Careers ECCIII 252
 Gifted Cluster
 Kennard CJA Elementary 384
 Enright CJA Middle 540
 International Cluster
 Dewey 408
 DeAndreis 490
 Soldan 900
 Visual and Performing Arts Cluster
 Shaw VPAI 380
 Carr Lane VPAII 572
 Marquette VPA Middle 630
 Central VPA High 840
 Math-Science Technology Cluster
 New constructionScience Center IIC 592
 New constructionGateway Elementary 582
 Mullanphy ILC 510
 New constructionMiddle 690
 O'Fallon Gateway High 1,600
 General Academic Cluster
 Euclid Montessori 720
 Washington Montessori
 Lyon ABI 288
 Mallinckrodt ABI 288
 Waring ABI 322
 Woerner IGE 432
 Busch AAA 300
 Metro High 240

*470
 Military Cluster
 Pruitt Middle 490
 Cleveland High 1,000
 ______
 14,116

 TABLE 3: DISTRIBUTION OF TARGET ENROLLMENTS BY GRADE LEVEL
 PS K-5 6-8 9-12
 Program Site Location Other PS KG 1 2 3 4 5 6 7 8 9 10 11 12 Total Total Total Total Total
-----------------------------------------------------------------------------------------------------------------------------------------------------------
Early Childhood Cluster
 ECC I Stix C 72 96 96 96 72 288 360
 ECC II Wilkinson C 30 60 72 72 72 60 216 306
 ECC III Health Ctrs. C 60 48 48 48 48 48 204 252
Gifted Cluster
 CJA  Elementary Kennard S 24 48 48 48 72 72 72 24 360 384
 CJA  Middle Enright N 180 180 180 540 540
International Studies
Cluster
 FLE Dewey C 24 48 48 48 72 72 72 24 384 408
 Foreign Language DeAndreis N 10 160 160 160 490 490
 International Studies Soldan N 245 226 220 209 900 900
Visual and Performing
Arts Cluster
 VPA  Elementary I Shaw S 20 48 48 48 72 72 72 380 380
 VPA  Elementary II Carr Lane N 20 48 72 72 72 96 96 96 48 524 572
 VPA  Middle Marquette C 30 200 200 200 630 630
 VPA  High Central N 240 210 200 190 840 840
Math-Science-Technology
Cluster
 Science Ctr./ILC New Construction S 40 48 48 48 48 120 120 120 48 544 592
 Gateway  Elementary New Construction N 30 48 72 72 72 96 96 96 48 534 582
 Btncl. Gds./ILC Mullanphy C 30 160 160 160 510 510
 Gateway  Middle New Construction N 30 220 220 220 690 690
 Gateway  High O'Fallon C 424 399 394 383 1,600 1,600
General Academic Cluster
 Montessori Washington/
 (incl. ECC IV) Euclid N 144 96 96 96 96 96 96 144 576 720
 ABI I Lyon S 48 48 48 48 48 48 288 288
 ABI II Mallinckrodt S 48 48 48 48 48 48 288 288
 ABI III Waring C 10 24 48 48 48 48 48 48 24 298 322
 IGE Woerner S 72 72 72 72 72 72 432 432
 Metro Metro C 65 60 60 55 240 240
 AAA Busch S 100 100 100 300 300
Military Cluster
 Military Middle Pruitt N 10 160 160 160 490 490
 Naval Junior ROTC Cleveland S 275 245 245 235 1,000 1,000

*471
 TABLE 4
 DISTRIBUTION OF L(1570)87 COSTS FOR 27 MAGNETS
(Playroom, classroom, magnet reconfiguration, costs unallocated by school in capital
 order)
 Internal Amount
 Conversion of Included
 Target L(1570)87 Playrooms Magnet in L(1570)87
 Magnet Schools Enrollment Amount + and Classrooms + Reconfiguration = per Building
Early Childhood Cluster
 Stix ECCI 360 $ 889,888 $20,000 $ 4,372 $ 914,260
 Wilkinson ECCII 306 679,606 20,000 65,835 765,441
 Health Careers ECCIII 252 282,111 0 0 282,111
Gifted Cluster
 Kennard CJA Elementary 384 0 0 0 0
 Enright CJA Middle 540 994,147 0 284,651 1,278,798
International Cluster
 Dewey 408 597,323 0 0 597,323
 DeAndreis[1] 490 489,162 0 500,000 989,162
 Soldan 900 2,717,434 0 0 2,717,434
Visual and Performing Arts Cluster
 Shaw VPAI 380 1,067,530 30,000 48,416 1,145,946
 Carr Lane VPAII 572 748,196 15,000 0 763,196
 Marquette VPA Middle 630 0 0 0 0
 Central VPA High 840 1,875,325 0 1,128,590 3,003,915
Math-Science Technology Cluster
 New constructionScience Center IIC 592 0 0 0 0
 New constructionGateway Elementary 582 0 0 0 0
 Mullanphy ILC 510 1,037,215 0 0 1,037,215
 New constructionMiddle 690 0 0 0 0
 O'Fallon Gateway High 1,600 2,078,800 0 0 2,078,800
General Academic Cluster
 Euclid Montessori ( 720 605,514 0 15,831 621,345
 Washington Montessori ( 470,791 0 0 470,791
 Lyon ABI 288 0 0 0 0
 Mallinckrodt ABI 288 856,814 0 41,163 897,977
 Waring ABI 322 874,897 0 1,581 876,478
 Woerner IGE 432 0 0 0 0
 Busch AAA 300 0 0 0 0
 Metro High 240 293,053 0 439,490 732,543
Military Cluster
 Pruitt Middle 490 0 0 0 0
 Cleveland High 1,000 2,403,545 0 328,880 2,732,425
 _______ ___________ _______ __________ ___________
 Subtotal 14,116 $18,961,351 $85,000 $2,858,809 $21,905,160
 Design/Administration Fee at 10% 1,896,135 8,500 285,881 2,190,516
 ___________ _______ __________ ___________
L(1570)87 Magnet Costs $20,857,486 $93,500 $3,144,690 $24,095,676

 TABLE 5
 ADDITIONS TO L(1570)87 AMOUNTS FOR 27 MAGNETS
 Recommended Additions to L(1570)87
 Amount
 Included
 Target in L(1570)87 General Magnet/Other New Magnet Plan
 Magnet Schools Enrollment per Building Rehabilitation Reconfiguration Construction Capital Budget
---------------------------------------------------------------------------------------------------------------------------------------
Early Childhood Cluster
 Stix ECCI 360 $ 914,260 $ 91,745 $ 221,963 $ 0 $ 313,708
 Wilkinson ECCII 306 765,441 192,498 0 0 192,498
 Health Careers ECCIII 252 282,111 20,014 149,281 0 169,295
Gifted Cluster
 Kennard CJA Elementary 384 0 885,012 140,000 375,000 1,400,012
 Enright CJA Middle 540 1,278,798 275,139 0 0 275,139
International Cluster
 Dewey 408 597,323 176,297 200,000 375,000 751,297
 DeAndreis 490 989,162 145,802 0 0 145,802
 Soldan 900 2,717,434 6,660 1,000,000 936,000 1,942,660

*472
Visual and Performing Arts Cluster
 Shaw VPAI 380 $ 1,145,946 $ 113,854 $ 50,000 $ 825,000 $ 988,854
 Carr Lane VPAII 572 763,196 235,746 100,000 1,200,000 1,535,746
 Marquette VPA Middle 630 0 357,756 100,000 2,386,845 2,844,601
 Central VPA High 840 3,003,915 20,610 0 0 20,610
Math-Science Technology Cluster
 New constructionScience Center
 IIC 592 0 0 0 5,038,124 5,038,124
 New constructionGateway Elementary 582 0 0 0 4,715,894 4,715,894
 Mullanphy ILC 510 1,037,215 169,700 250,000 2,097,628 2,517,328
 New constructionMiddle 690 0 0 0 7,073,840 7,073,840
 O'Fallon Gateway High 1,600 2,078,800 98,580 4,000,000 0 4,098,580
General Academic Cluster
 Euclid Montessori ( 720 621,345 245,214 0 0 245,214
 Washington Montessori ( 470,791 127 254,278 0 254,405
 Lyon ABI 288 0 915,272 140,000 375,000 1,430,272
 Mallinckrodt ABI 288 897,977 27,952 90,000 0 117,952
 Waring ABI 322 876,478 239,481 90,000 0 329,481
 Woerner IGE 432 0 786,730 140,000 375,000 1,301,730
 Busch AAA 300 0 371,446 101,297 760,000 1,232,743
 Metro High 240 732,543 95,191 0 0 95,191
Military Cluster
 Pruitt Middle 490 0 1,340,505 200,000 0 1,540,505
 Cleveland High 1,000 2,732,425 48,401 0 936,000 984,401
 _______ ___________ __________ __________ ___________ ___________
 14,116 $21,905,160 $6,859,732 $7,226,819 $27,469,331 $41,555,882
Design/Administration Fee at 10% 2,190,516 685,973 722,682 2,746,933 4,155,588
 ___________ __________ __________ ___________ ___________
 $24,095,676 $7,545,705 $7,949,501 $30,216,264 $45,711,470
Furniture, fixtures and equipment 5,761,156
 ___________
Total added to L(1570)87 $51,472,626

Table 5 Notes
1. Costs of magnet reconfigured, divided classrooms and reconfigured playrooms are assigned to schools and included in the amount per building column. (These costs were shown as total amounts in L(1570)87).
2. Additional playroom reconfiguration costs are provided for Kennard, Lyon, Mallinckrodt, Waring, and Woerner schools at $40,000 each. These are included in the magnet/other reconfiguration cost column.
3. New construction costs deleted from L(1840)88: library at Stix at $75,000; classrooms at Wilkinson at $1,037,279; all new construction at Euclid at $450,000; library and computer lab at Lyon at $165,000; and $504,153 ($879,153$375,000) for offices and auditorium at Mallinckrodt. However, a full-size gym with space for a stage is provided in Mallinckrodt's budget.
4. Architect and engineering fees in project totals for each school (Marquette addition, New Science, Gateway Elementary and Middle) have been deducted. A 10 percent design fee is added along with all other design fees.
5. The amount, $51,472,626, to be added to the duplicated L(1570)87 cost of $24,095,676 totals $75,568,302. This total reflects a reduction of $1,931,698 in L(1840)88 total costs of $77,500,000.
6. New construction at Marquette
MBA cost at $2,352,672 less A & E at $165,827 (A & E included in A & E for all projects). $200,000 for showers and lockers.
7. Science and Technology SchoolNew Construction
MBA cost estimate $12,247,196 plus $280,000 for site less A & E of $737,462 (A & E included in total). Total space: elementary 40 percent, middle school 60 percent.

*473
 $12,247,196 + $280,000 - $737,462 =
 $11,789,734
 Elementary $11,789,734 × 40% =
 $4,715,894
 Middle $11,789,734 × 60% = $7,073,840

8. Science Center ILC
A & E at $503,812 deducted from estimated cost at $5,541,936 and included in total A & E for all projects.
9. Mullanphy Addition
A & E at $209,763 deducted from the estimated cost at $2,307,391 and included in total A & E for all projects.
10. Furniture, fixtures and equipment for projects are estimated at $5,761,156, approximately 10 percent of total magnet capital costs.
11. L(1570)87 total cost would be adjusted downward for Hamilton Branch AAA Academy, Ames, Wade and Madison schools returned to inventory.

 TABLE 6
 Adjustments to Capital Improvements Order L(1570)87
Total amount ordered $114,717,941
Deduct L(1570)87 costs for schools closed or magnet
programs eliminated in magnet capital order
(includes playroom and magnet reconfiguration;
design fee)
Hamilton III AAA $ 344,300
Ames 497,684
Wade 959,847
Madison 1,336,656
McKinley 388,291
DeAndries 1,050,639 (4,577,417)
 ___________
Net adjusted capital improvements amount 110,140,524
 State share 50% $55,070,262
 Board share 50% 55,070,262
 Magnet Capital Budget
Approved Budget $ 51,472,626
 State share 71.5% $36,802,928
 Board share 28.5% 14,669,698
 Reconciliation with L(1840)88 Amounts
Magnet capital budget $ 51,472,626
Amounts duplicated in magnet capital budget and capital
improvements budget L(1570)87 $ 24,095,676
Adjustments to L(1840)88 amounts $ 1,931,698
 ____________
 $ 77,500,000
Deductions
Stix $ 75,000 Delete library. Is not needed.
Wilkinson 1,037,279 Classroom addition is not needed.
Euclid 450,000 Library and gym are not needed.
Lyon 165,000 Library and computer lab are not needed.
Mallinckrodt 504,153 Delete excess gym, classroom and office
 space
Wade 687,500 School closed. Delete entire additional
 amount.

*474
Mason $ 1,076,707 School closed. Delete entire amount.
Franklin 1,142,385 School closed. Delete entire amount.
Euclid Branch 66,299 School closed. Delete entire amount
 ___________
 Total $ 5,204,323
Additions
Dewey $ 751,297 Gym and additional rehabilitation and
 reconfiguration
Health 169,295 Additional Amount in original
Careers magnet plan.
Mullanphy 2,097,628 Additional amount in original magnet
 plan.
Washington 254,405 Additional amount in original magnet
 __________
 plan
 Total $ 3,272,625
Net Adjustment $ 1,931,698

*475
 Table 7
 MAGNET CAPITAL BUDGET
 (Unduplicated Magnet Plan Costs)
 Health/
 Building Building Safety/ Magnet Other New New New
Magnet School Sitework Envelope Interior Mechanical Electrical Handicapped Reconfiguration Reconfiguration Gyms Additions Buildings Total
Early Childhood Cluster
Stix ECC I $ 24,433 $ 1,661 $ 4,750 $ 0 $ 60,901 $ 0 $ 221,963 $ 0 $ 0 $ 0 0 313,708
Wilkinson ECC II 38,924 12,901 13,665 0 47,508 79,500 0 0 0 0 0 192,498
Health Careers ECC III 6,751 0 0 0 13,263 0 149,281 0 0 0 0 169,295
Gifted Cluster
Kennard CJA Elementary 101,023 307,557 113,921 81,578 202,975 77,958 90,000 50,000 375,000 0 0 1,400,012
Enright CJA Middle 11,500 48,345 109,844 0 9,450 96,000 0 0 0 0 0 275,139
International Cluster
Dewey 0 0 0 99,000 77,297 0 150,000 50,000 375,000 0 0 751,297
DeAndreis 12,871 7,431 6,019 0 39,981 79,500 0 0 0 0 0 145,802
Soldan 6,660 0 0 0 0 0 950,000 50,000 936,000 0 0 1,942,660
Visual and Performing Arts Cluster
Shaw VPA I 64,426 7,418 6,894 0 35,116 0 0 50,000 825,000 0 0 988,854
Carr Lane VPA II 20,750 0 19,335 0 116,161 79,500 50,000 50,000 1,200,000 0 0 1,535,746
Marquette VPA Middle 10,033 191,597 10,013 11,500 67,387 67,226 50,000 50,000 0 2,386,845 0 2,844,601
Central VPA High 20,610 0 0 0 0 0 0 0 0 0 0 20,610
Math-Science Technology Cluster
New Construction - Science ILC 0 0 0 0 0 0 0 0 0 0 5,038,124 5,038,124
New Construction - Gateway Elem. 0 0 0 0 0 0 0 0 0 0 4,715,894 4,715,894
Mullanphy ILC 22,925 10,068 4,907 0 52,300 79,500 200,000 50,000 0 2,097,628 0 2,517,328
New Construction - Middle 0 0 0 0 0 0 0 0 0 0 7,073,840 7,073,840
O'Fallon - Gateway High 11,846 (49) 39,479 3,600 43,704 0 3,700,000 300,000 0 0 0 4,098,580
General Academic Cluster
Euclid Montessori 46,674 10,581 63,138 0 45,321 79,500 0 0 0 0 0 245,214
Washington Montessori 0 127 0 0 0 0 244,278 10,000 0 0 0 254,405
Lyon ABI 142,894 94,676 294,461 63,025 175,680 144,536 90,000 50,000 375,000 0 0 1,430,272
Mallinckrodt ABI 27,952 0 0 0 0 0 41,163 48,837 0 0 0 117,952
Waring ABI 113,814 21,974 16,805 0 7,388 79,500 40,000 50,000 0 0 0 329,481
Woerner IGE 45,073 251,292 246,044 7,369 65,062 171,890 90,000 50,000 375,000 0 0 1,301,730
Busch AAA 83,968 26,540 72,812 20,050 101,818 66,258 101,297 0 0 760,000 0 1,232,743
Metro High 2,265 84 13,342 0 0 79,500 0 0 0 0 0 95,191
Military Cluster
Pruitt Middle 69,651 331,460 169,514 116,340 359,563 293,977 150,000 50,000 0 0 0 1,540,505
Cleveland High 48,401 0 0 0 0 0 0 0 936,000 0 0 984,401
 _________ __________ _________ ________ __________ __________ _________ ________ __________ __________ ___________ ___________
Subtotal $ 933,444 $1,323,663 $1,204,943 $402,462 $1,520,875 $1,474,345 6,317,982 $908,837 $5,397,000 $5,244,473 $16,827,858 $41,555,882
Design/administration fee
at 10% 93,344 132,367 120,494 40,246 152,088 147,434 631,798 90,884 539,700 524,447 1,682,786 4,155,588
 _________ __________ _________ ________ __________ __________ _________ ________ __________ __________ ___________ ___________
Subtotal $1,026,788 $1,456,030 $1,325,437 $442,708 $1,672,963 $1,621,779 $6,949,780 $999,721 $5,936,700 $5,768,920 $18,510,644 $45,711,470
Furniture, Fixtures, Equipment 5,761,156
 ___________
Total $51,472,626

*476
 TABLE 8
 STAFFING FOR MAGNET HIGH SCHOOLS
 Magnet FTE Calculation
 Target
__________________ = FTE yield
Average Class Size
 FTE yield
__________________ = instructional FTEs
 .71
(.71 represents 5 out of 7 periods to account for planning periods when
teachers are not providing direct instruction).
 High School FTEs
 c
 a b ADDITIONAL
PROGRAM LOCATION TARGET TOTAL BASIC MAGNET
ROTC Cleveland 1,000 59.00 50.00 9.00
VPA Central 840 49.00 42.00 7.00
Metro Metro 240 14.00 13.00 1.00
Int'l Stds Soldan 900 52.50 45.00 7.50
Gateway O'Fallon 1,600 93.50 80.00 13.50
 _____ ______ ______ _____
 Total 4,580 268.00 230.00 38.00
a  Based on overall average class size of 24.
b  Based on DESE calculations for non-magnet high school at 28.1
 PTR in all classes, seven-period day, sufficient to meet State high
 school graduation requirements. Costs attributable as regular
 operation costs.
c  Derived arithmetically: a - b = c. Costs attributable as magnet specialty
 costs due to reduced class size.
All numbers are rounded to nearest .50.

The FTEs shown above are those recommended for direct instruction. Additional personnel needs directly attributable to the magnet focus (enriched resources, to be allocated as magnet specialty costs) are indicated for each magnet high school. Instructional coordinators and magnet aides are provided in accord with current practices (attributable to magnet specialty costs). Some program coordinators may be phased-out after full implementation. This does not deal with other personnel.

ROTC
1.00 Military Science Coordinator
VPA
3.00 Program Coordinators (Honors Art, Honors Music,
 Mass Media)
2.00 Lab/Technicians
Metro
0.00
International Studies
3.00 Program Coordinators (specialty areas, university/business
 collaboratives
2.00 College Counselors (beyond regular allocation)
Gateway
6.00 Program Coordinators (specialty areas, university/business
 collaboratives)
4.00 College Counselors (beyond regular allocation)
4.00 Lab Technicians

*477
 TABLE 9
 STAFFING FOR MAGNET MIDDLE SCHOOLS
 Magnet FTE Calculation
 Target
 ------------------ = FTE yield
 Average Class Size
 FTE yield
 ------------------- = instructional FTEs
 .86
 (.86 represents 6 out of 7 periods to account for planning periods when
 teachers are not providing direct instruction).
 Example:
 Target = 600
 600 = 30
 20
 30 = 34.88
 .86
 Rounded to nearest .50 = 35.00 FTEs
 Thus, a magnet middle school for 600 students should be assigned 35.00
 FTE teaching personnel. This can then be allocated as needed among the
 different subject areas including all regular, elective and magnet specialty
 classes.
 For each magnet middle school included in this plan, the recommended FTE
 calculation at full implementation is shown. The same formula can be
 applied to any interim target set during the phase-in period until full
 implementation is reached. The formula can also be used to calculate FTE
 needs if enrollment exceeds the target at any point during the phase-in
 period.
 MIDDLE SCHOOL FTEs
 a b c
 TARGET TOTAL BASIC ADDIT.
PROGRAM LOCATION Reg/SpEd/Total Reg/SpEd/Total Reg/SpEd/Total MAGNET
----------------------------------------------------------------------------------
Gateway New 660/30/690 38.5 3 41.5 29.5 3 32.5 9.0
Military Pruitt 480/10/490 28.0 1 29.0 21.5 1 22.5 6.5
ILC Mullanphy 480/30/510 28.0 3 31.0 21.5 3 24.5 6.5
VPA Marquette 600/30/630 35.0 3 38.0 27.0 3 30.0 8.0
CJA Enright 540/ 0/540 31.5 0 31.5 24.0 0 24.0 7.5
Int'l Stds DeAndries 480/10/490 28.0 1 29.0 21.5 1 22.5 6.5
 _____ __ _____ _____ __ _____ ____
 TOTAL 189.0 11 200.0 145.0 11 156.0 44.0
 a  Based on overall average class size of 20 (plus special education).
 b  Based on average class size of 26. Costs attributable as regular
 operating costs.
 c  Derived arithmetically: Total in a minus Total in b = Total in c.
 Costs attributable as magnet specialty costs due to reduced class
 size.
 All numbers are rounded to nearest .50.
 The FTEs shown above are those recommended for direct instruction. In
 addition, Instructional Coordinators and magnet aides are provided in
 accord with current practices (attributable to magnet specialty costs). This
 does not deal with other personnel.

*478
 TABLE 10
 STAFFING FOR MAGNET ELEMENTARY SCHOOLS
 1.00 FTE (attributable to regular operating costs) is allocated to each
 classroom (PS-5 and special education). Additional personnel needs directly
 attributable to the magnet focus (enriched resources to be allocated as
 magnet specialty costs) are indicated for each magnet elementary school.
 Instructional coordinators and magnet aides are provided in accord with
 current practices, in addition to assigning a classroom aide to each preschool
 classroom in elementary magnets (as a magnet specialty cost). This
 does not deal with other personnel.
 Early Childhood Centers: 1.00 Classroom Aide/classroom
 I, II, III: 1.00 Computer Lab Aide/school
 Montessori Early 1.00 Administrative Assistant
 Childhood/Elementary: 1.00 Computer Lab Aide
 1.00 Classroom Aide/classroom
 Foreign Language: 3.00 Magnet Specialty
 1.00 Computer Lab Aide
 VPA (Shaw): 3.00 Magnet Specialty
 1.00 Computer Lab Aide
 VPA (Carr Lane): 4.00 Magnet Specialty
 1.00 Computer Lab Aide
 ILC (new): 5.00 Magnet Specialty
 1.00 Computer Lab Aide
 Gateway (new): 4.00 Magnet Specialty
 2.00 Computer/Lab Aides
 ABI (Lyon, Mallinckrodt Waring): 2.00 Magnet Specialty/school
 IGE (Woerner): 0.00 Magnet Specialty
 1.00 Computer Lab Aide
 CJA: 2.00 Magnet Specialty
 1.00 Computer Lab Aide

ORDER

[L (2131) 88]
This matter is before the Court on the State's motion to alter or amend judgment in L(2090)88 (a/k/a the Magnet Plan). L(2105)88. The City Board has filed a response. L(2119)88.
The Court has reviewed the several "clarifications" sought by the State and finds these "clarifications" to be nothing more than a reassertion of the State's arguments already considered by the Court. Court Order L(2090)88 is this Court's final determination on all the issues addressed (again) in the State's motion. There is no valid reason to alter or amend Order L(2090)88.
Accordingly,
IT IS HEREBY ORDERED that the State's motion to alter or amend judgment in L(2090)88, L(2105)88 be and is DENIED.
NOTES
[1] Defined as costs for building rehabilitation, renovation and additions; new construction; and start-up costs for equipment and furniture.
[2] Including non-capital start-up costs for personnel, staff development, supplies, etc.
[3] All tables are located in the attached Appendix.
[4] The only exceptions are for Classical Jr. Academy and Metro High School.
[5] Defined as brothers and sisters living at the same address.
[6] This county priority should be in effect up to an enrollment of 1,640 county students. Beyond this enrollment level, white county and city applicants would compete equally in the lottery.
[7] This fourth priority is recommended in order to increase equity of access for white city residents to magnet schools.
[8] Additional placements may be made subsequent to this to fill vacant seats.
[9] This number is derived based on the following assumptions:

(a) "Interdistrict" seats should meet the Eighth Circuit goal of 40% white county students in 6,000 interdistrict seats at a racial balance of 55% black/45% white, so (.45) × (6,000) - 2,700 white students - (.40 × (2,700) = 1,080 white county students in "interdistrict" seats.
(b) "Intradistrict" seats should maintain their level of white county enrollment, which is currently 7% of total enrollment, so (.07) × 8,000) = 560 white county students in "intradistrict" seats.
(c) 1,080 + 560 = 1,640.
As long as this total number of county students enroll in city magnets (no matter which magnets), the overall desegregative effect on the city is the same as if those students were all enrolled in only some magnets. For this reason, the total white county enrollment in all magnets is the measure which will be used.
[10] Liddell IX mandates that interdistrict magnets must meet a goal of 40% suburban white student enrollment, during a specified time period; otherwise the State may move the Court to change the magnet's funding or terminate it. Liddell IX at 282-83.
[11] As noted in Footnote 9 the total county white enrollment (in all 27 magnets) should be at least 1,640. In order to meet the requirements of Liddell IX, at least 12% of the student enrollment in each magnet must be county white. This "significant percentage" is derived as follows: 1,640 divided by 14,000 (total magnet enrollment) = 12%.
[12] The conversion of O'Fallon will be dealt with in detail in a subsequent memorandum opinion focusing on the 12(b) Vocational-Education Plan.
[13] The current Health Careers program should be integrated into the overall magnet program.
[14] These courses were suggested to the Court in discussions with Dr. Ralph Beacham, Executive Director of the MCC, concerning the conversion of O'Fallon. The Court suggests that the City Board work with Dr. Beacham concerning the integration of such courses into the overall magnet program at Gateway.
[15] Timing and the method of funding by the City Board and the State can be altered only by consent of both of these parties and Court approval.
[16] At all levels, special education teachers would be over and above regular allocations, consistent with State and Federal regulations for special needs students.
[17] Much of the material in this opinion is taken from the recommendations of the Magnet Panel as set out in the Original Plan. L(1585)87. The Court is indebted to the members for their unique vision and professional acumen. They are: Charles V. Willie, Professor of Education and Urban Studies, Graduate School of Education, Harvard University, Cambridge, Massachusetts, Eugene T. Reville, Superintendent of Schools, Buffalo Public Schools, New York and John A. Murphy, Superintendent of Schools, Prince Georges' County Public Schools, Maryland. The work of the Panel was successfully coordinated by Tracy Libros, Magnet Review Committee Executive Director. The assistance of financial advisor, Warren M. Brown and Jay Moody was invaluable, as was that of Tracey Elbein Litz and Lynn Norman, members of the Court's staff.
[1] (1570)87 allowed magnet reconfiguration costs of $1,455,129 for a math/science high school; however, this magnet plan allows only $500,000 magnet reconfiguration costs for a foreign language middle school.